IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>V.<br><br>SURGICAL CARE AFFILIATES, LLC, and<br>SCAI HOLDINGS, LLC | No. 3-21-cr-00011-L |

**[PROPOSED] REPLY TO DEFENDANTS' OPPOSITION
TO THE UNITED STATES' OMNIBUS MOTIONS *IN LIMINE***

The United States respectfully submits the following reply to Defendants' Opposition to the United States' Omnibus Motions *in Limine*. (ECF No. 147). Defendants' Opposition reflects a misunderstanding of key principles of antitrust law, including the type of conduct that falls within the per se unlawful category of market allocations, as well as the well-established intent standard that applies to per se unlawful antitrust crimes.

A.  **MIL 8: Defendants' suggestion that proof of a "market" is required in a per se case is contrary to Supreme Court precedent.**

The Defendants incorrectly argue that the absence of a "market" definition lowers the government's burden of proof. Opp. at 3. It does not, and to suggest otherwise mistakenly conflates the elements of a per se unlawful antitrust conspiracy with the prerequisites of a rule of reason case. The United States understands that Defendants are still awaiting the Court's ruling on their motion to dismiss—however, either the motion will be denied, and the per se charges in the indictment will stand, or the motion will be granted, and the indictment will be dismissed. The indictment does not charge a rule of reason case, and a ruling from this Court cannot amend the grand jury's charges. Thus, assuming the case is not dismissed and proceeds to trial, the Defendants will face charges on an offense under the per se rule. Defendants' suggestion

otherwise, Opp. at 11, and their citations to civil cases on that point, are inapt. *See, e.g.*, *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022) (explaining that in a criminal per se case there is no avenue to argue to the jury in the alternative that the rule of reason should apply).

The United States does not need to define a market in a per se case. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984) (noting that per se cases may proceed "without the necessity of *any analysis* of the market context in which the arrangement may be found" (emphasis added)). Market definition or an assessment of market power is often required in rule of reason cases, in order to assess the effects of a restraint. By contrast, no such analysis is required for a per se restraint. Per se restraints are definitionally anticompetitive. "They are all banned because of their actual or potential threat to the central nervous system of the economy," and "the law does not permit an inquiry into their reasonableness." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). Defendants offer no contrary authority—neither *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) (per curiam) nor *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), sets forth any requirement for a "market" definition; they merely describe the allocation agreement at issue, which in each of those cases happened to be a territorial allocation.

"Market allocation" is a shorthand, like "price fixing." But just as price-fixing cases do not require literal "fixing" of prices, *Socony-Vacuum Oil Co.*, 310 U.S. at 222, market-allocation cases do not require a literal "market" to be allocated, *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088 (5th Cir. 1978) (allocation of customers). And allocation agreements are equally unlawful regardless of their scope, or whether their participants allocate territories, products, services, customers, or employees. *See, e.g.*, *id.* at 1088 (finding unpersuasive any distinction between territorial allocation and customer allocation). *See also United States v.*

*Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018) (customer allocations unlawful even where they affect only a small number of potential customers, and conspiracy to rig a single bid, i.e., affect only a single customer, is subject to per se analysis) (citing *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992)); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("[A]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service division agreement, analogous to a product division agreement." (quoting XII Phillip E. Areeda et al., Antitrust Law ¶ 2013b at 143 (3d ed. 2007))).

Defendants thus err in suggesting that the indictment is about "the market for senior-level employees across the United States." Opp., *passim*. Here, the conspirators allocated their senior-level employees by agreeing to limit their competition against each other for the services of those employees. The indictment does not allege that the conspirators allocated the entire potential job market for those employees, and it does not need to for the conspiracies to qualify as per se unlawful market allocations. Nor do allocation agreements need to end all competition between the conspirators or prevent the movement or hiring of such employees—indeed, in a free society with at-will employment, it would likely be impossible to do so. *Cf. Socony-Vacuum Oil Co.*, 310 U.S. at 235 n.61 (rejecting argument that price-fixing conspiracy "did not eliminate all competition" as "wholly immaterial" to decision to apply per se rule); *see also Blackburn v. Sweeney*, 53 F.3d 825, 827 (7th Cir. 1995) (explaining that in *Topco* only 10% of the goods sold were the object of the allocation and that "[t]o fit under the per se rule an agreement need not foreclose all possible avenues of competition"). As the Fifth Circuit explained in *Cadillac*, "if conspirators engage in the allocation of customers, the 'customer's range of choice and ability to seek out the supplier who could give him better terms is curtailed.'" 568 F.2d at 1085 (quoting

*United States v. Consolidated Laundries Corporation*, 291 F.2d 563, 572 (2d Cir. 1961)). The court described the character of an allocation agreement as "repress[ing]" and "limit[ing]" the "free choice" of the affected customers—not eliminating all choices or stopping them from purchasing from anywhere in a broader product market. *Id.* at 1086. The existence of a broader employment "market" for such individuals is thus irrelevant to whether SCA entered the charged conspiracies with Company A and Company B.

B.  **MIL 9, 10, 11, 12:  Defendants' opposition rests on a legally incorrect intent standard.**

Defendants' opposition to the motions *in limine* on good intentions/harm, justifications, ancillarity, and knowledge of illegality, all rest on a fundamentally flawed understanding of the intent element of the charged per se unlawful antitrust conspiracy. The Defendants repeatedly argue that evidence is admissible because it relates to whether they entered the conspiracy "with the purpose of allocating the market for senior-level employees" or for "an unlawful purpose." Opp. at *passim*. The Defendants' arguments are largely based on an instruction given in the *DaVita* case.[1] *See United States v. DaVita Inc.*, No. 21-cr-229 (D. Colo. Apr. 13, 2022) ("*DaVita* Case"), ECF No. 254. But that out-of-circuit jury instruction is neither binding nor correct; it conflicts with Supreme Court and Fifth Circuit precedent.

The *DaVita* court erred in holding (and subsequently instructing the jury) that the "government will have to prove more than that defendants had entered into a non-solicitation agreement—it will have to prove that the defendants intended to allocate the market. . . ." *DaVita* Case ECF No. 132 at 19; *see* Final Instructions Given, *id.* ECF No. 254 at 19–21

---

[1] Contrary to Defendants' suggestion, Opp. at 8, the United States has never taken the position that a heightened intent standard was appropriate. In any event, the Court need not seek to unravel the parties' positions in that litigation, which were informed by and constrained by the prior rulings of the court in that matter.

(instructing jury that United States must prove that defendants "intended to allocate the market for senior level employees" and "for employees of DaVita" and that "you may not find that a conspiracy to allocate the market for the employees existed unless you find that the alleged agreements and understandings sought to end meaningful competition for the services of the affected employees").  This instruction runs contrary to the holdings of all appellate courts to have addressed the issue, including the Fifth Circuit, that the United States need not prove that defendants acted with specific "intent to restrain trade or commerce" in a per se case.  *See United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 683 (5th Cir. 1981); *United States v. All Star Indus.*, 962 F.2d 465, 474 n.18 (5th Cir. 1992).[2]

The United States has never claimed that intent is "irrelevant."  Opp. at 7.  But the Fifth Circuit has been clear that the "[G]overnment's only burden was to prove that the per se agreement alleged was in fact made and that defendants knowingly and intentionally joined that agreement."  *All Star Indus.*, 962 F.2d at 474.[3]  A purpose to "allocate the market," Opp. at 9, is not required.  Rather, the "intent element of a per se offense is established by evidence that the defendant agreed to engage in conduct that is per se illegal," *All Star Indus.*, 926 F.2d at 474 n.18—in this case, conspiracies to allocate senior-level employees through the charged non-

---

[2] *Accord United States v. Giordano*, 261 F.3d 1134, 1143–44 (11th Cir. 2001); *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 7 (1st Cir. 1997); *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1235 & n.5 (8th Cir. 1992); *United States v. Brown*, 936 F.2d 1042, 1046 (9th Cir. 1991); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 479–80 (10th Cir. 1990); *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988); *United States v. Koppers Co.*, 652 F.2d 290, 295–96 n.6 (2d Cir. 1981); *United States v. Soc'y of Indep. Gasoline Marketers*, 624 F.2d 461, 465 (4th Cir. 1979); *United States v. Gillen*, 599 F.2d 541, 545 (3d Cir. 1979).

[3] The court in *All-Star* uses the term "willfully" in places; however, its footnotes make clear that the term does not carry any heightened showing of intent or knowledge of illegality.  As noted in the Fifth Circuit pattern instructions, use of the term "willfully" is disfavored when it is not an element of the crime.  *See* Fifth Circuit Pattern Criminal Jury Instructions § 1.43 (2019 ed.).

solicitation agreements. The requirement of an agreement to achieve an unlawful purpose is satisfied by the showing that the purpose or object of the agreement is something that is prohibited by law, which is consistent with the Fifth Circuit pattern instruction on conspiracy. *See* Fifth Circuit Pattern Criminal Jury Instructions § 2.15A (2019 ed.) ("A 'conspiracy' is an agreement or mutual understanding between two or more persons to join together to accomplish some unlawful purpose."). In the antitrust context, where the indictment alleges the existence of a per se unlawful restraint—here, the agreement between competitors not to solicit each other's senior-level employees—that "necessarily illegal" restraint is itself the unlawful purpose. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).

The Fifth Circuit has specifically rejected the notion that any heightened intent standard applies to per se unlawful offenses, and explained that the intent necessary for a criminal conviction in a Sherman Act case is to knowingly do something that is prohibited as a matter of law. *See Cargo Serv. Stations, Inc.*, 657 F.2d at 681 (approving jury instruction that the "Government must prove beyond a reasonable doubt that the defendants knowingly did something which the law forbids"). The United States does not need to prove a specific purpose to allocate, an anticompetitive purpose, or a purpose to violate the law in the mind of the perpetrator. *See All Star Indus.*, 962 F.2d at 474 n.18 (no requirement to prove defendant "knew his actions were illegal or that he specifically intended to restrain trade or to violate the law").[4] Rather, the defendant must know the nature of the agreement and voluntarily join it.

---

[4] Defendants' suggestion that the government has not identified "a single case where a court, prior to trial, extended the ignorance-of-the-law principle to a blanket prohibition on the exclusion of such knowledge and intent evidence," Opp. at 18, is perplexing, given the numerous citations provided in the United States' motion, as well as in its authority for the jury instruction on this point. *See* ECF No. 127 at 49. In fact, even the *DaVita* court excluded such evidence. *See DaVita* Case, ECF No. 210 at 4 (granting government motion in limine to "exclude evidence/argument of defendants' claimed ignorance of the law").

Nothing in *Socony-Vacuum*, Opp. at 8, suggests otherwise. The Court explained in no uncertain terms that success of the conspiracy, good intentions of the participants, or business justifications are not permitted considerations. *Socony-Vacuum Oil Co.*, 310 U.S. at 224 n.59 (explaining that Sherman Act strikes down conspiracies regardless of success, and "[w]hatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness"); *id.* at 222 (good intentions of the members of the combination not a defense). Thus, agreements to allocate employees, like agreements to fix prices, cannot be saved from per se condemnation by assertions or even proof that the defendant entered them for a good purpose or with good intentions. *See Topco Assocs., Inc.*, 405 U.S. at 610 ("[The Supreme] Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended.").

Defendants' assertions that evidence about harm, justifications, and good intentions are relevant to a supposed "purpose to allocate" element thus are directly contrary to the controlling precedent on these issues. *See also United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362–63 (5th Cir. 1980) (explaining that in per se cases courts reject "argument that the restraint in the circumstances is justified by any procompetitive purpose or effect. . . . The per se rule is the trump card of antitrust law. When an antitrust plaintiff successfully plays it, he need only tally his score."). Defendants' "reasons," Opp. at 7, for entering the allocation agreements are similarly irrelevant. It does not matter whether Defendants' motives were pure. A bank robber may want money to feed his family, but that does not make participation in a scheme to rob a bank any less illegal, nor does his motive counter any element of the crime. Likewise, here, if Defendants knowingly participated in conduct that is categorically illegal, they acted with the required intent, *Cargo Serv. Stations, Inc.*, 657 F.2d at 681, even if they genuinely believed they

did it to enhance competition, to benefit employees, or to preserve friendships or the potential for future business collaborations. Defendants should not be permitted to circumvent the per se rule by "us[ing] the element of intent as a backdoor to bring an undue amount of competitive effects" or justification "evidence before the jury." *Aiyer*, 33 F.4th at 126.

When the charged conspiracy is per se unlawful, the Defendants cannot re-open the question of per se treatment before the jury—indeed, Defendants' motion to dismiss rests on the premise that the threshold question of per se treatment is a legal question for the Court. *See* ECF No. 38-1 at 7. Contrary to the Defendants' suggestion, Opp. at 8, the jury therefore will <u>not</u> be asked to decide factual questions about whether SCA's no-poach agreements had any purpose beyond stifling competition. Those are questions asked and answered by the per se rule itself because under that rule, the allocation agreements among competitors are "unlawful in and of themselves." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Aside from the commerce element, the United States' only burden in a per se case is to prove that the charged agreement existed and the Defendants knowingly joined it. *See All Star Indus.*, 962 F.2d at 474.

C.     **MIL 11: Defendants' opposition shows that their alleged "ancillarity" evidence is nothing more than after-the-fact improper justification evidence.**

Defendants' opposition confirms their intention is to offer irrelevant, disconnected business justification evidence for their unlawful conspiracies. They point to the testimony of their own former CEO who testified that these conspiracies were "important" to the "relationships" with their competitors. Opp. at 13. But that is not the standard for ancillarity. If it were, the doctrine would be meaningless, and any price fixer or customer allocator could escape per se condemnation by claiming that it was necessary to enter a price-fixing or customer-allocation agreement to maintain a good relationship with a competitor.

Defendants' argument that ancillarity is not an "affirmative defense" is misplaced. Opp. at 14–15. Much like *any* defense in a criminal case, evidence is not relevant and is properly excluded when it is offered "for the sole purpose of supporting an unassertable defense." *United States v. Ragsdale*, 426 F.3d 765, 778 (5th Cir. 2005) (testimony related to advice of counsel defense excluded). Defendants must meet their burden of production if they intend to seek a defense instruction on a theory, and if they will be unable to meet such a burden, it is improper to inject irrelevant evidence into a trial.[5] While it is true that the Court has the discretion to conditionally admit evidence, the Court should not do that here without a satisfactory pretrial proffer about which specific business transactions the Defendants will contend that each of these unlawful agreements is ancillary to, and how they were subordinate and reasonably necessary to achieve the procompetitive purpose of those transactions.[6] The Court should exercise its gatekeeping function under Rules 103 and 104 here for two reasons: (1) the unique circumstance in which the Defendants' own agent, who entered the agreements, has already testified to facts that negate key elements of such a defense, and (2) the body of antitrust case law that that specifically *precludes* the introduction of such justification evidence in a per se case when it would be insufficient to support a valid ancillarity defense. A pretrial proffer is precisely what the court in *United States v. Nusbaum* did when the antitrust defendants in that case suggested that they would put forward legally insufficient evidence for a joint venture defense. 2009 WL

---

[5] The court in the *DaVita* case did in fact grant the United States' motion *in limine* to exclude defendants' evidence as insufficient to establish an ancillarity defense, *see DaVita* Case ECF No. 210 at 10–11, but the court erred in permitting business transaction evidence as relevant to the question of whether the "subject agreements had a purpose of promoting competition," *id.* at 11. This was improper and contrary to Supreme Court and Fifth Circuit precedent as set forth above.
[6] The example offered in the Defendants' opposition proves the government's point. An agreement struck at least as early as 2012 (i.e. Count Two), by definition, cannot have been part of and subordinate to a business transaction that was not entered until 2014. *See* Opp. at 16.

4738075, at *1 (D. Md. Dec. 4, 2009). Because this type of evidence is impermissible when insufficient to meet the elements of the defense, the prejudice that will flow from allowing Defendants to put volumes of irrelevant evidence before the jury is not something that could be easily remedied with an instruction to disregard it.

**D.     MIL 13:  The Court should exclude evidence and argument regarding the 2016 "Antitrust Guidance for Human Resources Professionals" ("Guidance")**

A witness's knowledge about the Guidance is not a *Giglio* issue. Opp. at 20. The Guidance did not criminalize any conduct, nor immunize any individual. Defendants can certainly cross examine witnesses on any actual nonprosecution agreements or declination letters. But the Guidance is not relevant to that point. Notably, the one witness at the *DaVita* trial who mentioned the Guidance was SCA's former Chief Talent Officer, who did not work for SCA when the Guidance was issued in October 2016. Her after-the-fact reading of the Guidance has no bearing on any element of the crime, nor her credibility, and Defendants' footnote 14 confirms that their attempt to inject it into the trial is nothing more than an improper effort to suggest to the jury the same meritless due process arguments made in their motion to dismiss.

## CONCLUSION

For the foregoing reasons, the United States' motions *in limine* should be granted.

DATED: October 7, 2022            Respectfully submitted,

*/s/ Megan S. Lewis*
MEGAN S. LEWIS, DC Bar No. 500720
WILLIAM J. VIGEN, DC Bar No. 997316
TERENCE A. PARKER, NY Bar No. 5775192
Attorneys
U.S. Department of Justice, Antitrust Division
Washington Criminal II Section
Tel: 202-598-8145 / Fax: 202-514-9082
Email: megan.lewis@usdoj.gov