**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| V. | No. 3-21-cr-00011-L |
| SURGICAL CARE AFFILIATES, LLC, and SCAI HOLDINGS, LLC | |

**UNITED STATES' RESPONSE TO DEFENDANTS'
SUPPLEMENTAL MOTIONS *IN LIMINE***

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ....................................................................................................................... 1

   I.    THE TELL-YOUR-BOSS RULE IS PART OF THE CHARGED CONSPIRACIES. ....... 1

      A.    Evidence of the Tell-Your-Boss Rule is Relevant and Not Unfairly Prejudicial ......... 2

      B.    Admitting Evidence of the Tell-Your-Boss Rule Will Not Constructively Amend the Indictment. ...................................................................................................................... 6

   II.    RULE 407 DOES NOT APPLY TO ACTIONS TAKEN BY NON-PARTIES. ............. 8

   III.    SALARY AND COMPENSATION EVIDENCE TIED TO THE CHARGED CONSPIRACIES IS RELEVANT. ........................................................................................ 9

CONCLUSION .................................................................................................................... 12

CERTIFICATE OF SERVICE ................................................................................................. 13

## TABLE OF AUTHORITIES

**CASES**……………………………………………………………………………. **Page(s)**

*Diehl v. Blaw-Knox*, 360 F.3d 426 (3d Cir. 2004) ........................................................................ 8

*Dixon v. Int'l Harvester Co.*, 754 F.2d 573 (5th Cir. 1985) ........................................................... 8

*In re High Fructose Corn Syrup Anti. Litig.*, 295 F.3d 651 (7th Cir. 2002) ................................ 11

*Lolie v. Ohio Brass Co.*, 502 F.2d 741 (7th Cir. 1974) .................................................................. 9

*Mehojah v. Drummond*, 56 F.3d 1213 (10th Cir. 1995) ................................................................ 8

*O'Dell v. Hercules, Inc.*, 904 F.2d 1194 (8th Cir. 1990) ............................................................... 9

*Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880 (9th Cir. 1991) ................................................ 9

*Ponds v. Force Corp.*, 2017 WL 67530 (E.D. La. Jan. 6, 2017) ................................................... 8

*Raymond v. Raymond Corp.*, 938 F.2d 1518 (1st Cir. 1991) ........................................................ 9

*TLT–Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397 (4th Cir. 1994) ........................................ 9

*United States v. Adams*, 778 F.2d 1117 (5th Cir. 1985) ............................................................... 7

*United States v. All Star Indus.*, 962 F.2d 465 (5th Cir. 1992) ................................................... 12

*United States v. Avants*, 367 F.3d 433 (5th Cir. 2004) ................................................................. 5

*United States v. Bizzard*, 615 F.2d 1080 (5th Cir. 1980) .............................................................. 7

*United States v. Calverley*, 37 F.3d 160 (5th Cir. 1994) ............................................................ 12

*United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676 (5th Cir. 1981) ................................. 12

*United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005) ........................................................... 6

*United States v. Davis*, 461 F.2d 83 (5th Cir. 1972) .................................................................... 7

*United States v. Girod*, 646 F.3d 304 (5th Cir. 2011) .................................................................. 6

*United States v. Haga*, 821 F.2d 1036 (5th Cir. 1987) ................................................................ 7

*United States v. McRae*, 593 F.2d 700 (5th Cir. 1979) ................................................................ 5

*United States v. Pace*, 10 F.3d 1106 (5th Cir. 1993) ........................................................................ 4

*United States v. Stanford*, 805 F.3d 557 (5th Cir. 2015) .................................................................. 6

*United States v. Wilson*, 355 F.3d 358 (5th Cir. 2003) .................................................................... 5

 **OTHER AUTHORITIES........**……………………………………………………..... **Page(s)**

*United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo.)................................................................... 3

**RULES**………………………………………………………………………………. **Page(s)**

Fed. R. Evid. 403 ........................................................................................................................ 4, 5

Fed. R. Evid. 407 ...................................................................................................................... 1, 8, 9

The United States respectfully submits the following response to Defendants' supplemental motions *in limine*, ECF No. 182.  The Court should deny Defendants' motions *in limine* because evidence of the tell-your-boss rule is relevant to the charged conspiracies and would not constructively amend the indictment; Federal Rule of Evidence 407 does not apply to remedial measures taken by non-parties; and the United States' compensation evidence is directly relevant to proving the existence of the charged conspiracies, unlike Defendants' generalized compensation evidence.

## ARGUMENT

### I.   THE TELL-YOUR-BOSS RULE IS PART OF THE CHARGED CONSPIRACIES.

Evidence of the tell-your-boss rule is plainly admissible because that conduct is a central part of the conspiracies charged in the indictment.  It is not, as Defendants suggest, Mot. at 2, an "independent practice"—but was a part of the conspiratorial agreements themselves.  Indeed, the indictment includes four subparagraphs in the means and methods section describing how the Defendants and their co-conspirators used the tell-your-boss rule to implement their employee-allocation conspiracies.  As the indictment alleges, "[f]or the purpose of forming and participating in the charged conspiracy," Defendants and their co-conspirator in Count One:

> (d) monitored compliance with the agreement by requiring senior-level employees of defendant and Company A who applied to the other company to notify their current employer that they were seeking other employment in order for their applications to be considered-for example, on or about October 16, 2015, Individual 1 emailed a human resources executive at SCA: "Putting two companies in italics ([Company A] and [Company B]) - we can recruit junior people (below Director), but <u>our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking</u>."; (emphasis added)
>
> (e) informed senior-level employees of SCA and Company A who were candidates for employment at the other company that they were required to provide such notice to their current employer-for example, on or about November 1, 2013, employees of Company A discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks . . ." Individual 2 replied "We do have that agreement and want to stick by it. If [candidate] indeed did approach us, and is willing to

tell [Individual 1] that I'm ok." The senior human resources employee at Company A commented "Yikes, she is not going to want to do that. But I will check."

Indict. ¶ 11(d), (e).

For Count Two, the indictment repeats paragraph 11(d) shown above, *see* Indict. ¶ 19(d), and includes an additional paragraph about the tell-your-boss rule related to Company B, Defendants' co-conspirator for that count:

> (e) informed senior-level employees of SCA and Company B who were candidates for employment at the other company that they were required to provide such notice to their current employer-for example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from Company B who was based in Dallas, Texas, that she could not recruit from Company B "unless candidates have been given explicit permission by their employers that they can be considered for employment with us."

Indict. ¶ 19(e).

### A. Evidence of the Tell-Your-Boss Rule is Relevant and Not Unfairly Prejudicial

Evidence concerning the tell-your-boss rule is highly probative of the indictment's allegations because it goes to the existence of the charged conspiracies and corporate liability based on the Defendants' then-CEO in forming, implementing, and monitoring the conspiracies. At trial, the United States will be required to prove that the conspiracy existed and that Defendants, as corporate entities, are criminally liable. Evidence of the tell-your-boss rule is directly relevant, and, indeed, central evidence to establish those elements.

Prior testimony from Defendants' former CEO (which the United States intends to elicit again during this trial) shows that the tell-your-boss rule served both a monitoring and implementation aspect in the conspiracies. On the implementation point, Defendants' former CEO testified as follows:

> *A.* We agreed not to solicit each other's senior executives.
> *Q.* And was there a further aspect to that agreement, as well?

> *A.* Yes. If the senior executives was already looking at outside jobs and had told their supervisor, then we could solicit.

Apr. 6, 2022 Trial Tr. 174:5–20, *United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo.). Given that testimony from Defendants' former CEO, it is plain that the tell-your-boss rule is important evidence for establishing the existence of the charged agreement—which is an element of the offense, and thus highly relevant.

Defendants' former CEO also testified that the tell-your-boss rule served to "prevent cheating," *DaVita* Apr. 6, 2022 Trial Tr. 184:10–21—in other words, to ensure that the competitor company was not secretly soliciting the other co-conspirator company's employees. On the monitoring point, Defendants' former CEO testified that the tell-your-boss rule served as "a way to audit or ensure that the person actually was looking [to leave their current employer]." *DaVita* Apr. 6, 2022 Trial Tr. 177:1–24. Thus, the prior testimony from Defendants' former CEO shows how the tell-your-boss rule was directly relevant to the conspiracies charged in the indictment. This testimony regarding monitoring the agreement, too, shows that the tell-your-boss rule is relevant to establishing the existence of the charged agreement: that the conspirators put in place a system to monitor compliance with the agreements confirms that the underlying agreements, in fact, existed. If the conspirators never reached an agreement, there would be nothing to monitor. And it is likewise relevant for witnesses to explain why they viewed the tell-your-boss rule as being a necessary tool for monitoring the agreement, since that evidence, too, goes to the existence of the agreement and Defendants' knowing participation in the agreement.

Moreover, the Defendants' suggestion that the "chilling effect" from this practice is "independent" from the conspiracies, Mot. at 3, is meritless. Not only was the reluctance of candidates to tell their boss described as part of the means and methods in the indictment, *see* Indict. ¶ 11(e) ("Yikes, she is not going to want to do that."), but testimony that will be elicited at

trial will explain how individuals' reluctance to tell their boss was used to allocate employees to their respective employers and place them off limits to the competitor company through the non-solicitation agreements. Defendants have suggested that they intend to put on evidence through their expert that "the alleged conspirators could not reasonably have believed that the limited alleged agreements between them could allocate senior-level employees," ECF No. 146, as relevant to whether these agreements existed. Evidence about the chilling aspect of the tell-your-boss part of the agreement directly refutes this defense argument and helps establish the existence of the conspiratorial agreements charged in the indictment.

Similarly, evidence that the Defendants' former CEO used the tell-your-boss rule to monitor and implement the charged agreement is relevant to establishing Defendants' corporate liability. That the tell-your-boss rule received attention from high-level corporate officers tends to show that Defendants' agreements with Companies A and B were not the result of a frolic by a low-level employee but were instead actions that were authorized and approved by individuals who were in a position to impute liability to the company as a whole.

Defendants' argument that evidence of the tell-your-boss rule is unduly prejudicial, and thus inadmissible under Federal Rule of Evidence 403, also fails. Rule 403 permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." Fed. R. Evid. 403. Exclusion under Rule 403, the Fifth Circuit has long held, "should occur only sparingly." *United States v. Pace*, 10 F.3d 1106, 1115 (5th Cir. 1993).

Here, as already explained, the indictment alleges that the Defendants and their co-conspirators used the tell-your-boss rule as a means and method of monitoring and implementing the charged conspiracies. In essence, then, the Defendants' Rule 403 argument amounts to a

claim that it would be prejudicial for the jury to hear about how they monitored and implemented the charged conspiracies. To be sure, admitting the statements will be prejudicial to the Defendants, as is the case with all evidence tending to show a defendant's guilt. But Rule 403 does not exclude relevant evidence because of mere prejudice. *See United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004) ("The prejudicial effect of the testimony was that, if the jury found it credible, it would be more likely to find that the Government had met its burden in proving [the defendant's] guilt. Obviously, this is not the kind of unfair prejudice that Rule 403 is meant to prevent."). Instead, Rule 403 operates only to exclude evidence that presents a risk of *unfair* prejudice, and even then, only when that risk *substantially* outweighs the evidence's probative value. *See United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) ("Relevant evidence is inherently prejudicial; but it is only [u]nfair prejudice, [s]ubstantially outweighing probative value, which permits exclusion of relevant matter under Rule 403."). Because the tell-your-boss rule evidence goes to central issues in the case—the existence of the conspiracies and Defendants' knowing participation in them—the Rule 403 balance weighs heavily in favor of admission. *See, e.g.*, *United States v. Wilson*, 355 F.3d 358, 361 (5th Cir. 2003) (district court did not abuse discretion in admitting evidence substantiating a "central issue in the case").

Moreover, Defendants' Rule 403 argument rests of their contention that prejudice would stem from conviction on an uncharged theory. That, however, is an argument for constructive amendment, not prejudice under Rule 403. And, as explained below, there is no basis to find a constructive amendment because the tell-your-boss rule was alleged in the indictment with respect to both counts. Beyond that, Defendants have pointed to no reason to think the tell-your-boss rule is so inflammatory that its unfair prejudice would substantially outweigh its considerable relevance.

### B. Admitting Evidence of the Tell-Your-Boss Rule Will Not Constructively Amend the Indictment.

Allowing evidence and testimony about the tell-your-boss rule would not result in a constructive amendment of the indictment. As the Fifth Circuit has explained, a constructive amendment "occurs when the government changes its theory at trial, allowing the jury to convict on a broader basis than that alleged in the indictment, or when the government proves an essential element of the crime on an alternate basis authorized by the statute but not charged in the indictment." *United States v. Stanford*, 805 F.3d 557, 565 (5th Cir. 2015) (citing *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011)).

Here, however, the United States alleged in the indictment that the Defendants used the tell-your-boss rule to monitor and implement the charged conspiracies. *See* Indict. ¶¶ 11(d)–(e); 19(d)–(e). These are not "passing" references, as Defendants suggest, Mot. at 2, but rather descriptive allegations of the means and methods Defendants used to form and participate in the charged conspiracies. Moreover, Defendants have cited no authority for the proposition that there is a constructive amendment of an indictment when the evidence at issue was alleged in the indictment's means and methods section.

Defendants highlight *United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005), as a case supporting their argument, yet that case presented a set of facts very different from what the Court encounters here. In *Chambers*, the government sought to prove the interstate commerce element of a firearms offense using a theory that was never alleged in the indictment—that component parts of ammunition travelled in interstate commerce (not alleged in the indictment), rather than the assembled rounds of ammunition (alleged in the indictment). *Id.* at 241–42. By contrast, here, the United States alleged in the indictment that the tell-your-boss rule was a means and method that Defendants and their co-conspirators used to form and implement the

conspiracy. Whereas *Chambers* dealt with an alternative theory of an essential element that appeared nowhere in the indictment, here the tell-your-boss rule has been in the indictment the entire time. *See* Indict. ¶¶ 11(d)–(e); 19(d)–(e).

All of the cases that Defendants string cite in their motion are similarly inapt. In every case, the government offered evidence to prove a theory not alleged in the indictment—which, at the risk of repetition, is far different from using evidence of a means and method alleged explicitly in the indictment. *See United States v. Haga*, 821 F.2d 1036, 1045–46 (5th Cir. 1987) (government proved an object of the conspiracy not alleged in the indictment); *United States v. Adams*, 778 F.2d 1117, 1124 (5th Cir. 1985) (government proved a false statement through evidence that defendant misrepresented his address, yet the indictment alleged only that the defendant misrepresented his name); *United States v. Davis*, 461 F.2d 83, 91 (5th Cir. 1972) (government proved mail theft through evidence that defendant stole letters from the mail, but had alleged in the indictment only that the defendant took mail from "an authorized depository"); *see also United States v. Bizzard*, 615 F.2d 1080, 1081 (5th Cir. 1980) (trial judge misinstructed the jury on the elements they must find, which differs considerably from the constructive amendment claim Defendants raise here).

The Defendants have not cited a single case where the government offered evidence of a means and method alleged in the indictment and the Fifth Circuit found that to evidence to cause a constructive amendment of the indictment. And that makes perfect sense: there is no bait and switch here; the evidence that the United States intends to offer is directly relevant to what it alleged in the indictment. Accordingly, the Court should deny the Defendants' claim that offering evidence of the tell-your-boss rule risks constructively amending the indictment.

**II.     RULE 407 DOES NOT APPLY TO ACTIONS TAKEN BY NON-PARTIES.**

Defendants' motion to exclude under Rule 407 Company A's actions to lift its recruiting restrictions from SCA fails for a simple reason: Rule 407 does not apply to remedial measures taken by non-parties.[1]  *See Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 583 (5th Cir. 1985) ("Since these [remedial measures] were made by a non-defendant, Rule 407 does not bar the evidence.").  Every exhibit that Defendants' motion seeks to exclude under Rule 407 relates to actions taken by Company A, a non-party to this case.  Yet, it is plainly established in the Fifth Circuit that Rule 407 does not exclude evidence of a non-party's remedial measures.  *Dixon*, 754 F.2d at 583; *see, e.g.*, *Ponds v. Force Corp.*, 2017 WL 67530, at *2 (E.D. La. Jan. 6, 2017) ("Although on its face Rule 407 does not distinguish between parties and non-parties, federal courts are in agreement that Rule 407 is not implicated where the evidence concerns remedial measures taken by an individual or entity that is not a party to the lawsuit." (citing *Dixon*, 754 F.2d at 583)).

Indeed, every court of appeals to address the issue shares the Fifth Circuit's view that Rule 407 does not exclude a non-party's subsequent remedial measures.  *See Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3d Cir. 2004) ("It is noteworthy that each of the circuits to address this issue has concluded that Rule 407 does not apply to subsequent remedial measures taken by a non-party."); *Mehojah v. Drummond*, 56 F.3d 1213, 1215 (10th Cir. 1995); *TLT–Babcock, Inc. v.*

---

[1] The United States does not concede that the emails Defendants cite are in fact "remedial measures" within the meaning of Rule 407—but because that question is not dispositive here, assumes for purposes of argument that they are remedial measures as to Company A. Defendants' suggestion that the United States has "reversed course," Mot. at 7, on its position on remedial measures is wholly without merit.  As the United States previously represented to this Court:  "For clarity of the record, the United States agreed that it would not seek to introduce evidence of remedial measures such as changes to corporate compliance programs.  Evidence such as statements or emails instructing employees to lift the no-poach restrictions are not encompassed within that."  ECF No. 145.

*Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994); *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1523–24 (1st Cir. 1991); *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 888 (9th Cir. 1991); *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1204 (8th Cir. 1990); *Lolie v. Ohio Brass Co.*, 502 F.2d 741, 744 (7th Cir. 1974) (per curiam).

Defendants' motion ignores entirely this longstanding, widely shared interpretation of Rule 407.  Even if the Court assumes that Defendants are right that the exhibits show remedial measures, because Company A is not a party, the Rule 407 inquiry never makes it past the starting line.  None of the exhibits referenced in Defendants' motion show *Defendants* taking subsequent remedial measures, and Defendants acknowledge as much in their motion.  Mot. at 9 ("These statements reflect 'changes in policy and procedures' *at Company A* . . . ." (emphasis added)).  The United States has been consistent in its position that it will not seek to offer evidence of *Defendants'* compliance policy changes that post-date the start of the investigation in this case, absent Defendants opening the door to such evidence at trial.  Accordingly, the Court should deny Defendants' motion.

### III.    SALARY AND COMPENSATION EVIDENCE TIED TO THE CHARGED CONSPIRACIES IS RELEVANT.

The United States' position on salary and compensation evidence is consistent: evidence tied to the charged conspiracies is relevant; generalized evidence not tied to the charged conspiracies is irrelevant.  The former is the contemporaneous evidence noticed by the United States and it should be admitted.  The latter is the expert evidence and other evidence noticed by the Defendants and it should be excluded.  Defendants' motion inaccurately characterizes this

issue as the United States seeking to admit "preferred" evidence, Mot. at 10—it is not a question of preference; it is a question of relevance to the elements of the charged crime.

Defendants' conditional motion to exclude compensation and salary evidence identifies documents on the United States' exhibit list related to a single event. *See* Mot. at 9–10 (citing GX083–84, GX086–89, GX136). In December 2015, an external recruiting firm hired by SCA attempted to recruit a senior-level employee of Company A. *See* GX089. In response, a Company A human resources employee posited that SCA's "search firm is not aware of" the companies' "agreement not to recruit," and suggested that Company A's CEO contact Defendants' CEO to make him aware of the action of its recruiting firm in violation of the agreement. *Id.* But Company A took another action in response to the recruitment. A senior Company A executive asked whether the senior-level employee of Company A who was recruited was appropriately compensated. *See* GX088. After learning of his salary, the senior Company A executive responded: "Yikes." *Id.* The senior Company A executive then approved a 12.5% salary increase for the senior-level employee of Company A. *See id.* A senior executive of Company A provided final approval for the salary increase, noting: "[W]e have a deal with SCA that we won't recruit each other's people. [Company A's CEO] made the deal with [ SCA's CEO] so assume he'll want to follow up with him." *Id.* This executive also asked if there were any other similar senior-level employees "that are under market that we should be proactive with?" *Id.* As a result of this question, at least six additional Company A employees were considered for salary raises. *See* GX084.

The United States' evidence concerning this recruitment event is relevant because it is directly tied to the non-solicitation agreement between Defendants and Company A charged in Count One. Granting Defendants' motion would have the effect of excluding directly relevant

evidence confirming the existence of the agreement. *See* GX089 ("[Company A executive] mentioned that you and [Defendants' CEO] have an agreement not to recruit from each other's company."); GX088 ("Also, we have a deal with SCA that we won't recruit each other's people. [Company A's CEO] made the deal with [Defendants' CEO] so assume he'll want to follow up with him."). The evidence also shows how SCA and Company A are competitors in the recruitment and retention of senior-level employees, as charged in the indictment. Indict. ¶ 6. The evidence in question will be offered to prove that the two companies were otherwise competitors for employees, in addition to proving the existence of the agreement not to solicit.

In contrast, Defendants' noticed expert testimony on generalized compensation data is not tied to the charged conspiracies in any way. Some courts have allowed defense experts to analyze economic data in per se cases where the expert compared data from the alleged conspiracy period to outside the alleged conspiracy period to determine if there is economic evidence that the conspiracy existed. *See, e.g.*, *In re High Fructose Corn Syrup Anti. Litig.*, 295 F.3d 651, 660 (7th Cir. 2002). If Defendants had developed or timely noticed such evidence, their arguments for admissibility would have been much stronger. But Defendants chose not to do so, and their expert has not put forward any such evidence. Instead, he has just looked at the "trends in average base salaries and total compensation" at SCA, ECF No. 114 at 3, arguing that because compensation trended up, the alleged agreements must not have existed, *id.* at 8. This argument is specious, however. Even if SCA's compensation trended up over the life of the conspiracy, that tells nothing about whether the charged conspiratorial agreements existed or even whether the compensation could have been even higher but-for the charged conspiracies. This is why the United States moved to exclude the expert testimony. *See* ECF No. 128 at 7–8.

The United States' motion *in limine* to exclude evidence of lack of harm is similarly based on a principled and consistent position. *See* ECF No. 126 at 7–9. Evidence that the charged conspiracies may not have harmed employees is irrelevant and inadmissible to defend against per se Sherman Act charges. That is because the United States "does not have to prove that the defendants specifically intended to unreasonably restrain trade or that such conduct is an unreasonable restraint of trade." *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 683–85 (5th Cir. 1981). "[T]he government's only burden [is] to prove that the per se agreement alleged was in fact made and that defendants knowingly and intentionally joined that agreement." *United States v. All Star Indus.*, 962 F.2d 465, 468–69, 474–75 (5th Cir. 1992), *abrogated on other grounds by United States v. Calverley*, 37 F.3d 160, 163 (5th Cir. 1994). Defendants seek to admit generalized lack of harm evidence in an attempt to defend this case on a "no harm, no foul" defense. But that is not the law, and such evidence should be excluded when offered for that purpose.

## CONCLUSION

For the foregoing reasons, the Defendants' motions *in limine* should be denied.

DATED: December 1, 2022            Respectfully submitted,

*/s/ Terence A. Parker*
TERENCE A. PARKER, NY Bar No. 5775192
MEGAN S. LEWIS, DC Bar No. 500720
WILLIAM J. VIGEN, DC Bar No. 997316
Attorneys
U.S. Department of Justice, Antitrust Division
Washington Criminal II Section
Tel: 202-705-6156 / Fax: 202-514-9082
Email: terence.parker2@usdoj.gov

## CERTIFICATE OF SERVICE

On December 1, 2022, I filed this document with the Clerk of the Court using CM/ECF, which will serve this document on all counsel of record.

                                          /s/ Terence A. Parker
                                          TERENCE A. PARKER